## STATE v. JOHN STEEN.

(Filed 8 June, 1923.)

**1. Evidence—Witnesses—Character—Hearsay.**

A character witness is confined to the general reputation of the person whose character is attacked or supported, in the community in which he lives, depending upon what the witness has heard or learned as to the general opinion of his standing in the community, evidence of this kind being a matter of hearsay.

**2. Same—Investigation of Character.**

The law-abiding citizens of a town associated themselves together for the purpose of aiding the enforcement of law and order, especially the prohibition law, which was being extensively violated there, and for the purpose employed a detective from another state to investigate and procure evidence for a conviction: *Held*, competent, the testimony of a citizen of the town and a man of high character, who was sent to the community in which the detective resided for the purpose of investigation, and in anticipated attack upon his evidence, that he had made an investigation of the witness's character, and he would say it was good.

**3. Same—Appeal and Error—Objections and Exceptions.**

The question as to whether a character witness has qualified himself to give his testimony by first saying he knew the general reputation of the person, is not presented on appeal, when no exception has been taken on that ground in the appellant's brief, but only to his answer to the question, after he has stated a proper ground upon which he had based his opinion.

ADAMS and CLARKSON, JJ., concurring; HOKE and STACY, JJ., dissenting, STACY, J., writing the dissenting opinion.

APPEAL by defendant from *Long, J.,* at October Term, 1922, of RICHMOND.

The defendant was convicted upon two bills of indictment charging sales of liquor to one Harry Sapphire. It appears from the evidence that conditions as to "bootlegging" in that town and county were such that the good citizens of the town of Rockingham organized a club to secure the enforcement of laws, among them W. N. Everett, now Secretary of State, and Walter L. Parsons, formerly a Senator, and other prominent and well known citizens of the State, as appears from the affidavits in the record, of which Mr. Everett's is a sample, that "there has been such widespread violation of the liquor laws in Richmond County, and that by reason of the numerous reports of violations and the inability of the officers of the town and county to arrest the violators of such laws on account of such officers being generally known, and the violators of such laws through their organization being kept posted on the movements of such officers, the boards of town and county commissioners, through their mayor and chairman, respectively, have agreed to

have the violation of the liquor laws investigated by an outside representative, and to prosecute any and all persons dealing in liquor." His affidavit further states that the "boards of town and county commissioners have been actuated by the highest motives in the employment of an investigator to ascertain violation of the liquor laws; that such action on the part of said boards has been for the best interests of the town and county, and with regard and pursuant to their duties as such commissioners," and that "the McLendon Club is an organization of Christian men of Richmond County, formed for the purpose of fostering Christian ideals, and to secure enforcement of all laws of the State," and was not "an organization to persecute any person or persons, but to prosecute any and all violators of the law."

There are a large number of affidavits in the record to sustain the action taken to procure the investigation of such violations. In order to ferret out the guilty parties, a detective from Atlanta was secured, with whose aid evidence was laid before the grand jury, indictments were found, and on trial the defendant was convicted of violation of the liquor laws in two cases.

Knowing that an attack would naturally be made upon the character of the detective, A. G. Corpening, one of the town commissioners, went to Atlanta after the preliminary hearing of the case against the defendant, and shortly before the trial in the Superior Court, to investigate as to his character. At the trial the following question was asked, "Mr. Corpening, have you made any investigation of Mr. Sapphire's character?" Objection by defendant, overruled, and exception. To the above question the witness replied, "I made a trip to Atlanta and made a personal investigation, and from my investigation I would say his character was good." This exception presents the only question necessary to consider in this action.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*W. R. Jones for defendant.*

CLARK, C. J. The evidence as to the guilt of the defendant is practically without exception, but the defendant insists that this matter as to the character of the witness is fatal. The defendant's counsel, in his brief, raises no objection to the fact that the usual preliminary question was not put to this witness: "Do you know the general character of the witness Sapphire?" but bases his objection entirely upon the character of the testimony given in by Mr. Corpening, "Mr. Corpening swears that Sapphire's character was good, and states the ground for his testi-

mony; that he made the trip to Atlanta, made a personal investigation, and from his investigation would say that Sapphire's character was good."

From the record and the large number of affidavits filed, it is apparent that conditions were such in Rockingham and Richmond County that the good citizens organized what was called the "McLendon Club" to secure the enforcement of laws of the State. The board of commissioners of the town and county thought it necessary, in order to break up the great amount of whiskey dealing in said town and county, to employ a detective. They obtained from the detective agency in Atlanta, Harry Sapphire, one of their agents. He came to Rockingham, went to work and secured much of the evidence upon which the defendant was convicted. His residence was in Atlanta. The defendant contends that Corpening's testimony as to the evidence of general reputation obtained in this manner is not admissible. There is evidence of Corpening's high character. It would seem that being sent there by the officials of the town and by the good people who organized for the purpose of enforcing the law, that his motives could not be questioned, but however that might be, it was for the jury, his fellow-citizens, to weigh his testimony. It was just to the defendant as well as to the State to ascertain the character of the witness Sapphire. Evidence as to Sapphire's character could not otherwise well have been placed before the jury other than by the method used. Depositions by witnesses living in Atlanta would not have been competent, nor could witnesses have been brought from there as to Sapphire's character, for that would have required proof of the character of such witnesses themselves. The jury were entitled to know Sapphire's character, which could not have been proven in any better way than by sending, as was done, a reliable, well known citizen of the county and of the town to investigate his standing and general character in Atlanta, where he lived. It is reasonable that under these circumstances Corpening was better informed as to the general character of Sapphire than the casual acquaintances, who are usually brought forward as character witnesses.

In North Carolina the testimony of a character witness is confined to the general reputation of the person whose character is attacked, or supported, in the community in which he lives. *S. v. Parks,* 25 N. C., 296; *S. v. Perkins,* 66 N. C., 126; *S. v. Gee,* 92 N. C., 756; *S. v. Wheeler,* 104 N. C., 893; *S. v. Coley,* 114 N. C., 879, and numerous other cases since. Reputation is the general opinion, good or bad, held of a person by those of a community in which he resides. This is eminently a matter of hearsay, based upon what the witness has heard or learned, not as to any particular acts, but as to the general opinion or standing in the community.

Corpening's testimony could not be excluded as hearsay, for that is general reputation. The question was, What was Sapphire's general reputation in Atlanta, where he lived? If a resident of Atlanta had been brought as a witness at this trial, and put upon the stand, he might have testified that he had never heard anything against Sapphire's character in Atlanta, and his testimony would have been admissible, its weight being left to the jury, as was Corpening's.

Corpening himself was well known to the jury. He stated in effect that he had been to Atlanta, that he had investigated as to the reputation—that is, the general character that Sapphire bore there, and his evidence being based upon such investigation, as he states, was certainly not inferior to the statements of casual acquaintances or others who are so often put upon the stand as character witnesses, and whose testimony is necessarily based upon hearsay—that is, what people say in regard to the person whose character is in question.

The defendant relied strenuously upon what was said in *S. v. Parks,* 25 N. C., 296. In that case Johnathan Worth was put upon the stand to impeach the character of one Lane. Worth, upon cross-examination, stated that he "did not know Lane's general character in his neighborhood; that he was not certain that he knew his general character in the county; that he did not know whether a majority of those he heard speak spoke well or ill of it, but that he had heard a great many respectable men speak well of Lane's character and a great many equally respectable speak ill of it." In that case the Court held that the testimony of Worth was erroneously received, because "the witness is not to be discredited because of the opinion which any person, or any number of persons, may have expressed to his disadvantage, unless such opinions have created or indicated a general reputation of his want of moral principle. The impeached witness must, therefore, profess to know the general reputation of the witness sought to be discredited before he can be heard to speak of his own opinion or others as to the reliance to be placed upon the testimony of the impeached witness. *S. v. Boswell,* 13 N. C., 209; *Downey v. Smith,* 18 N. C., 62." In that case Jonathan Worth expressly stated that he did not know the general character of Lane, that he had heard a great many people speak both for and against him. It is very certain, therefore, that his testimony as to the character of Lane should have been rejected.

The present case is in strong contrast. The witness testified that he went to Atlanta to ascertain what was the general reputation of the impeached witness. That he had investigated, and that implies, of course, that under all these circumstances he had made careful inquiry such as could have been produced before the jury if the trial had taken

place in Atlanta, and that as a result of his investigation he would say that Sapphire's character was good.

The issue in this case was as to the violation of law alleged against the defendant. The question as to character of Sapphire, one of the witnesses against him, was, so to speak, entirely collateral. It was intended only to give to the jury some estimate of the weight they should give to the testimony of the witness Sapphire. The officials and leading public citizens had taken the trouble and been at the expense of sending Corpening (who was admittedly a man of high character in the community) to Atlanta to inquire as to the general reputation of the witness Sapphire. This speaks well for their sense of justice. The jury have passed upon the credibility of Corpening. Unlike Jonathan Worth in the case above quoted, Corpening stated that he had investigated as to Sapphire's character, and would say from such investigation that it was good.

It is rarely that the character witness can testify from investigation as to the good or bad character of the witness to which he testified. It was open to the defendant to bring witnesses from Atlanta to testify, if they could have done so, that Sapphire's general character was bad in that community. The good citizens of Rockingham, in enforcing the law, wished to be just. There is no question that the testimony, if believed by the jury, was that Corpening had gone to Atlanta for the purpose of ascertaining the general reputation of Sapphire among the people who knew him, that he had carefully investigated it, and that he had found that his general reputation was good.

It is not often that a character witness can show himself so competent to testify as to the character of another, as Corpening on this occasion. His testimony was properly submitted to the jury for what weight they saw fit to give it.

After the fullest and most careful consideration of this case, we find

No error.

ADAMS, J., concurring: The defendant relies upon three exceptions, neither of which in my judgment can be sustained, and for this reason I do not hesitate to concur in the opinion of the Court as written by the *Chief Justice.*

1. The defendant entered a formal motion to quash the indictment on the ground that certain members of the grand jury, by whom the bill was returned, were directly or indirectly interested in the prosecution of the defendant; but both the opinion of the Court and the dissenting opinion of *Associate Justice Stacy, sub silentio,* admit that this exception requires no discussion.

2. The defendant's exception to his Honor's charge, I am convinced is equally untenable. It is freely conceded that the burden of proving an *alibi* does not rest upon the defendant, and that it is incumbent upon the State to establish his guilt beyond a reasonable doubt; but, as I see it, the instruction complained of strictly complies with these principles. If there is one ruling to which this Court has adhered, it is that the instructions given by a trial judge shall be considered in their entirety and not in disjointed, detached, or isolated paragraphs; and when thus treated, his Honor's charge was less favorable to the State than were several other charges that have been sustained on appeal. With respect to the *alibi,* the judge gave this instruction: "If one accused of crime, when the time and place of the commission of the alleged crime is fixed, can show, and does show, that at that time, and at the place alleged, that he was not there, and it would have been impossible for him to have committed the crime, that is evidence that the jury may consider in passing upon the question, and if it is established he could not have committed the crime on account of being elsewhere at the time and place fixed, why that would be a defense." And at the close of the charge he said: "Now, are you satisfied beyond a reasonable doubt that this defendant made these sales as charged by the State? These sales of spirituous liquor to Mr. Sapphire? If so, it would be your duty to convict him. If you have a reasonable doubt about it, it would be your duty to acquit."

In *S. v. Freeman,* 100 N. C., 429, the trial judge, after telling the jury that the burden was upon the State to show the defendant's guilt beyond a reasonable doubt, gave this additional instruction: "The rule of law is, in a case of this kind, where the prisoner sets up the defense of an *alibi*—that is, that he was at some other place at the time when the crime was committed—the burden of proof rests on the prisoner to establish the fact to the satisfaction of the jury that he was not present, but was at some other place when the crime was committed. If the jury is satisfied from the evidence that the prisoner remained at home on the night in question, this would be an end of the case, and the prisoner should be acquitted; but if they are not satisfied of the truth of the *alibi,* then it is for them to say whether they are satisfied beyond a reasonable doubt that the rape was committed upon the person of the prosecutrix by the prisoner, as alleged by the State." Commenting on the charge, *Chief Justice Smith* said: "While we do not assent to what is said about the shifting of the burden of proof, when the proof offered by the prisoner tends to show his absence from the place where the offense was perpetrated, and his presence elsewhere at the time, yet the charge in general is so clear and explicit as to what is required of the State in

order to a conviction that it could not be misleading to the jurors, fairly considered."

And in *S. v. Bryant,* 178 N. C., 705, *Mr. Justice Walker* said: "The judge's charge on the question of the *alibi* was, it seems to us, not prejudicial to the defendant. He charged substantially that the prisoner relies upon an *alibi,* which means that he was not, and could not have been at the place of the homicide when it was committed, as he was elsewhere at the time. He is not required to satisfy you of the *alibi* beyond a reasonable doubt, but if the jury is satisfied from the evidence that he was not at the place when the homicide was committed, and at the time when the deceased met her death, then a verdict of not guilty should be returned, etc. But if the jury is not so satisfied, then it is for the jury to consider all the evidence and say whether or not they are satisfied from the evidence, beyond a reasonable doubt, that the prisoner killed the deceased, etc. This instruction was not erroneous, but followed our decisions. *S. v. Jaynes,* 78 N. C., 504; *S. v. Reitz,* 83 N. C., 634; *S. v. Starnes,* 94 N. C., 973; *S. v. Freeman,* 100 N. C., 429; *S. v. Rochelle,* 156 N. C., 641."

In these cases the court expressly or substantially imposed upon the defendant the burden of proving his *alibi,* and in each case the instruction was sustained. But in the instant case the learned judge did not go so far. As I understand them, his instructions, taken together, mean this: If the defendant showed that he was at the particular places designated by his witnesses when the sales were made, this would be a defense; but even if he failed to do so, the burden would still rest upon the State to satisfy the jury beyond a reasonable doubt that he made the sales at the dates and places testified to by the witnesses for the prosecution.

The instruction is in line with the decisions of this Court.

3. In considering the exception referring to the testimony of A. G. Corpening, it is important to keep in view the restricted scope of the examination, and to avoid confusion by the insertion of extraneous and unrelated questions.

Our decisions have unquestionably settled the principle that a witness will not be allowed to testify as to general character until he shall have first qualified himself by saying that he knows the reputation of the person whose character is in question, when objection is made on that ground, but I think this is not the ground presented in the defendant's brief. The *Chief Justice* has well said that the defendant raises no objection to the fact that the usual preliminary question was not put to the witness, and his conclusion is abundantly supported by the defendant's brief. Apart from reference to certain portions of his Honor's charge, the learned counsel states the gravamen of his exception in these

words: "It is a fundamental principle of character evidence that the witness must have the foundation for forming his opinion or the means of knowing the general character of the party." Emphasis is laid not on the knowledge acquired, but on the means by which it is acquired, "the foundation for forming his opinion." To this one question the argument was addressed, and it appears that the only attack on the admission of the evidence or the qualification of the witness rests on the admitted fact that he went to Atlanta and investigated Sapphire's character; so the exception presents the direct question whether evidence as to character, based on knowledge acquired by such investigation, is admissible as a matter of law.

In opposition it is urged that the witness necessarily speaks, not of his own knowledge, but of what he has learned. True, what another has told the witness about one's character is not competent in itself (*S. v. Mills,* 184 N. C., 694), but in its ultimate analysis a witness's estimate of general character is a composite of what he has heard and otherwise acquired. I find nothing in the record restricting the witness's knowledge to what he had heard. Whether it was so restricted was a matter to be elicited by cross-examination. Greenleaf very clearly draws the distinction between character and reputation (1 Ev., sec. 461-d), but in our courts "general character" is treated in actual practice as synonymous with general reputation. Upon this principle it is generally held, as shown by cases cited in the dissenting opinion, that it is not indispensable that a witness should have resided in the same community with the person of whose character he proposes to testify, the chief requirement being that the witness's knowledge must be derived from intercourse with the neighbors or associates of the person whose character is in question. I can see no convincing reason why such knowledge cannot be acquired by one who goes into a particular community for the particular purpose of attaining this end. Whether the witness has actually acquired such knowledge may in some instances be a preliminary question for the court when properly raised, and in others a question for the jury, but this does not warrant the assumption that such knowledge cannot be acquired in the manner indicated.

Again, it is said that if this practice is allowed it will be possible for a party to procure the testimony of prejudiced witnesses. In its practical operation this objection may be urged against the law as it now stands. In a criminal action the State can neither compel the attendance nor take the deposition of a nonresident witness. But the defendant is not precluded; he has the right to introduce the deposition of witnesses, resident and nonresident. The objection, practically applied, would confer upon the defendant in such action exclusive access to the testimony of nonresident witnesses, prejudiced or otherwise, subject, of

course, to cross-examination by the State. What doctrine could impart greater solace to a defendant whose conviction depended on the testimony of a nonresident witness?

The two cases apparently supporting the exception are *Douglass v. Tousey,* 20 A. D. (N. Y.), 616, and *Reid v. Reid,* 17 N. J. Eq., 101, but they are distinguishable from the case at bar. In the former a witness went to another part of the State to subpœna witnesses and "learn the character" of the prosecutrix, but there being evidence only of the witness's subjective opinion, the proposed evidence was excluded as hearsay. And in *Reid's case, supra,* the witness merely detailed the opinions of others. On the other hand, in *Foulkes·v. Sellway,* 3 Esp., 236, *Lord Kenyon* sustained the testimony of a witness who had gone to the place where the plaintiff lived to inquire into his character.

My conclusion is this: living in the same community with a witness whose character is under investigation is not indispensable to a knowledge of his character, for as Greenleaf says the witness to reputation must be óne who by residence in the community, or otherwise, has had an opportunity to learn the community's estimate; and if the witness has knowledge of such estimate he is qualified to testify. I think my conclusion is sustained by the general trend of the decisions.

CLARKSON, J., concurring: After a witness has been examined in chief, his credit may be sustained or impeached in various modes: (1) By proving or disproving the facts stated by him, by the testimony of other witnesses; (2) by general evidence affecting his credit for truth and veracity or general moral character. The regular mode of examining into the general reputation is to inquire of the witness whether he knows the general reputation of the person in question among his neighbors, and what that reputation is. Greenleaf on Evidence, vol. 1 (15 ed.), sec. 461; *S. v. Efler,* 85 N. C., 585. This law and practice has been long recognized by our courts.

While upholding the rule of evidence stated in the exhaustive dissenting opinion of *Associate Justice Stacy,* I think upon the whole record the defendant is not entitled to a new trial. "It is now the settled rule of appellate courts that verdicts and judgments will not be set aside for harmless error, or. for mere error and no more. To accomplish this result, it must be made to appear not only that the ruling complained of was erroneous, but that it was material and prejudicial, amounting to a denial of some substantial right. Our system of appeals, providing for a review of the trial court on questions of law, is founded upon sound public policy, and appellate courts will not encourage litigation by reversing judgments for slight error, or for stated objections, which could not have prejudiced the rights of appellate in any material way." *In re Ross,* 182 N. C., 478.

STACY, J., dissenting: The principal evidence against the defendant was that given by Harry Sapphire, a detective, who testified that he had purchased liquor from the defendant on five different occasions. The jury convicted on two counts and acquitted on three, though the evidence on all five of the charges was of the same character. .

In support of Sapphire's testimony, the State offered A. G. Corpening, a character witness, who testified as follows:

"Q. Have you made any investigation of Mr. Sapphire and his character? (Objection; overruled; exception by defendant.)    A. I made a trip to Atlanta and made a personal investigation, and from my investigation I would say his character was good."

"And to the overruling of the objection and admission of the answer the defendant excepts."

To my mind the natural and correct interpretation to be placed on the testimony of A. G. Corpening is that he was not undertaking to speak of his own knowledge concerning the character of the witness Sapphire, but was giving the result of his investigation, or the conclusion reached by him, from what others had told him, or from what he had learned about the witness in Atlanta. The record is silent as to whether this investigation was long or short, or whether it was made among friends and acquaintances or strangers, or whether his informers were few or many. He does not say that he knows the general reputation or character of the witness, and this is a necessary prerequisite or qualification to his right to testify under our decisions. . .

"It is fully recognized that in the trial of causes the testimony of a witness may be impeached by evidence of his bad character; and it is equally well established that before this is allowed the impeaching witness must qualify himself by saying, under oath, that he knows what such character is." *Hoke, J.,* in *S. v. Mills,* 184 N. C., 695.

"No principle of evidence is more clearly settled in North Carolina, nor by a longer line of decisions, than that a witness will not be allowed to testify as to character until he shall have first qualified himself by stating that he knows the reputation of the person in question." *Avery, J.,* in *S. v. Coley,* 114 N. C., 879.

"The witness is not to be discredited, because of the opinions which any person or any number of persons may have expressed to his disadvantage, unless such opinions have created or indicate a *general reputation* of his want of moral principle. The impeaching witness must, therefore, profess to know the general reputation of the witness sought to be discredited before he can be heard to speak of his own opinion or of the opinion of others, as to the reliance to be placed on the testimony of the impeached witness." *Gaston, J.,* in *S. v. Parks,* 25 N. C., 296.

"The rule as to this matter has been fully settled by many decisions of this Court. It is this: The party himself, when he goes upon the witness stand, can be asked questions as to particular acts, impeaching his character, but as to other witnesses it is only competent to ask the witness if he 'knows the general character of the party.' If he answers 'No,' he must be stood aside. If he answers 'Yes,' then the witness can, of his own accord, qualify his testimony as to what extent the character of the party attacked is good or bad." *Clark, C. J.,* in *Edwards v. Price,* 162 N. C., 244. See, also, *S. v. Haywood,* 182 N. C., 815; *S. v. Killian,* 173 N. C., 796; *Tillotson v. Currin,* 176 N. C., 484; *S. v. Robertson,* 166 N. C., 356; *S. v. Holly,* 155 N. C., 485; *S. v. Ussery,* 118 N. C., 1177; *S. v. Gee,* 92 N. C., 760.

An impeaching or sustaining witness is not to speak of the general reputation or character of another unless he knows it, and such knowledge must be founded on an acquaintance and intercourse with the neighbors or associates of the person whose character is in question. This intercourse, of necessity, must be of some length of time sufficient, at least, to enable the witness to gather the general esteem or estimation in which the party is held in the community where he resides, or at the place where he carries on his business. *Curtis v. Fay,* 37 Barb., 64. It is not indispensable that the witness should have resided in the same community with the person, of whose character he proposes to testify (though the contrary is supported by authority), but he must speak of his own knowledge and not merely from what others have told him, for this would be no more than reputation of reputation, or hearsay. *S. v. Lambert,* 104 Me., 394; *Reid v. Reid,* 17 N. J. Eq., 101; *Douglass v. Tousey,* 2 Wend., 352; 20 Am. Dec., 616, and note; 10 R. C. L., 954.

"It is not enough that the impeaching witness professes merely to state what he has heard 'others say'; for those others may be but few. He must be able to state what is *generally said* of the person, by those among whom he dwells, or with whom he is chiefly conversant; for it is this only that constitutes his general reputation or character. And, ordinarily, the witness ought himself to come from the neighborhood of the person whose character is in question. If he is a stranger, sent thither by the adverse party to learn his character, he will not be allowed to testify as to the result of his inquiries; but otherwise, the court will not undertake to determine, by a preliminary inquiry, whether the impeaching witness has sufficient knowledge of the fact to enable him to testify; but will leave the value of his testimony to be determined by the jury." Greenleaf on Evidence, sec. 461.

"In order to discredit a witness, you can examine only to his general character. . . . But it was remarked by plaintiff's counsel that witnesses do not always understand what is meant by general character;

and, therefore, it is necessary to vary the question, so as to adapt it to their comprehension. That is true, and therefore there is no impropriety in proposing the question in various forms, so that the substance be retained. But you must never depart from general character. . . . There are few men of whom some do not speak well, and some evil. ('Woe unto you when all men shall speak well of you.' Luke, 6:26.) But the question is, What is said by people in general? This is the true point of inquiry, and everything which stops short of it is incorrect." *Tilghman, C. J.,* in *Wike v. Lightner,* 11 Ser. & Rawle, p. 199.

"When it is attempted to impeach a witness on account of a want of moral character, it cannot be done by the impeaching witness 'merely stating what he has heard others say, for those others may be but few. He must be able to state what is generally said of a person, by those among whom he dwells or with whom he is chiefly conversant, for it is this only which constitutes his general character.' " *Mr. Justice Wayne* in *Gaines v. Helf et al.,* 12 How., 555.

"(The witness to reputation) must be able to state what is generally said of the person by those among whom he dwells, or with whom he is chiefly conversant, not by those among or with whom he may have sojourned for a brief period, and who have had neither time nor opportunity to test his conduct, acts, or declarations, or to form a correct estimate of either. A man's character is to be judged by the general tenor and current of his life, and not by a mere episode in it." *Brace, J.,* in *Waddingham v. Hulett,* 92 Mo., 533. See, also, Wigmore on Evidence, sec. 1616, and cases there cited.

In *Mawson v. Hartsink,* 4 Esp. Rep. (Eng.), 103 (cited with approval in *S. v. O'Neale,* 26 N. C., 88), an impeaching witness was asked to state whether he had made particular inquiries as to the general character of a witness about which he proposed to testify. *Lord Ellenborough* ruled that the question was improper, and gave the following reasons for his position: "That cannot be evidence. That information must be from persons not on their oaths; perhaps not reliable. If this were allowed, when it was known that a witness was likely to be called, it would be possible for the opposite party to send around to persons who had prejudices against him, and from thence to form an opinion, which was afterwards to be told in court, to destroy his credit."

The words of *Lord Ellenborough* are particularly appropriate here, for, to my mind, the precedent we are setting is a dangerous one. In the *O'Neale case,* 26 N. C., 88, an impeaching witness was asked if he knew the general character of another witness. He replied that he did not know whether he did or not. He was then asked "whether he knew in what estimation Elizabeth Earnest was held in his neighborhood before she left it." The Court said the latter question was properly

excluded because it was too circumscribed, and did not amount to an inquiry as to her *general* character before she left the neighborhood. It will be observed that in the case at bar the witness does not even purport to speak of *general* character; but I do not place my dissent on this ground. That would be too narrow and technical. Where the testimony of a character witness is objected to, as it is here, he should be required to qualify himself by first saying that he knows the general character of the witness, or party, before he is allowed to give his testimony in evidence. This is the direct holding with us in a number of cases heretofore cited. See, also, *S. v. Wheeler,* 104 N. C., 893; *S. v. Hairston,* 121 N. C., 582; *S. v. Efler,* 85 N. C., 585.

Again, in *S. v. Boswell,* 13 N. C., 211, *Toomer, J.,* speaking directly to the question now under consideration, used the following language: "A witness introduced to impeach the general character of another should not be permitted to give evidence of particular facts, nor repeat hearsay of strangers to the witness, whose testimony is intended to be discredited. He should only speak of the general moral character of the witness, as known among his neighbors and acquaintances. The discrediting witness should not express an opinion founded on his knowledge of particular facts, nor upon the hearsay of strangers to the witness intended to be discredited." Some of the expressions employed in this opinion were subsequently disapproved in *Hooper v. Moore,* 48 N. C., 430; but, in no case, has the above portion of the opinion been overruled, criticised, or disapproved. On the other hand, this language was quoted with approval by *Smith, C. J.,* in *S. v. Bullard,* 100 N. C., 488; and, indeed, its correctness can hardly be the subject of cavil or debate. See *McQuiggan v. Ladd,* 79 B. T., 90; 14 L. R. A. (N. S.), 689, and note; *People v. Van Gaasbeck,* 189 N. Y., 408; 22 L. R. A. (N. S.), 650, and note. This latter note contains an exhaustive review of the English and American authorities on the subject.

By the general character or reputation of every individual, that is, by the estimation in which he is held in the society or neighborhood where he is known, his word and his oath are valued. If his general character be free from imputation, his testimony weighs well. But if it be sullied, in the same proportion his word will be doubted. An impeaching or sustaining witness should speak only of his own knowledge, and then only with regard to the settled judgment or estimate of the community, touching the moral stamina or worth of the party whose character is in question. "Character," said *Mr. Erskine,* in the trial of Thomas Hardy for treason, "is the slow-spreading influence of opinion, arising from the deportment of a man in society. As a man's deportment, good or bad, necessarily produces one circle without another, and so extends itself till it unites in one general opinion, that general opinion is allowed to

be given in evidence." 24 State Trials, p. 1079. The rule is that where an impeaching or sustaining witness is called, he must first qualify himself by saying whether he knows the general reputation or character of the witness or party about which he proposes to testify. If he answer that he does not, he should be stood aside without being cross-examined on the subject. And if he reply in the affirmative, he should be confined to general reputation or character. This is not an idle matter; for, in many cases, its proper enforcement is essential to a fair and impartial administration of justice. Due process of law is something more than a high-sounding phrase; and the well established rules of evidence have been adopted, not merely for book-writing and law-school instruction, but the primary purpose of such adoption is for actual observance in the trial of causes.

Again, the defendant excepts to the following part of the charge: "If one accused of crime—when the time and place of the commission of the alleged crime is fixed, can show and does show that at that time and at the place alleged, that he was not there, and it would have been impossible for him to have committed the crime, that is evidence that the jury may consider passing upon the question, and if it is established he could not have committed the crime on account of being elsewhere at the time and placed fixed, why that would be a defense."

The foregoing is all that was said to the jury in regard to the defendant's alibi. True, in the closing paragraph of the charge, his Honor instructed the jury that they must be satisfied beyond a reasonable doubt of the defendant's guilt before a verdict could be rendered against him, and that, if they had a reasonable doubt about it, it would be their duty to acquit the defendant. But this was far removed from the above instruction, which forms the basis of the defendant's fifth exception.

In *S. v. Jaynes,* 78 N. C., 504, it was said: "The burden of proving an alibi did not rest upon the prisoner. The burden remained upon the State to satisfy the jury upon the whole evidence of the guilt of the prisoner. It was only necessary for the prisoner in his defense to produce such an amount of testimony, whether by evidence tending to show an alibi or otherwise, as to produce in the minds of the jury a reasonable doubt of his guilt." To like effect are the following cases: *S. v. Bryant,* 178 N. C., 702; *S. v. Rochelle,* 156 N. C., 641; *S. v. Freeman,* 100 N. C., 429; *S. v. Starnes,* 94 N. C., 973; *S. v. Reitz,* 83 N. C., 634. See, also, 12 Cyc., 619.

An alibi—meaning "elsewhere"—is not, properly speaking, a defense within any accurate meaning of the word "defense"; but it is a mere fact which may be used to call in question the identity of the person charged, or the entire basis of the prosecution. 8 R. C. L., 124 and 224.

In *Schultz v. Territory,* 5 Ariz., 239; 52 Pac., 352, the law upon the subject of an alibi seems to be very satisfactorily stated as follows: "The burden of proof never rests upon the accused to show his innocence, or to disprove the facts necessary to establish the crime with which he is charged. The defendant's presence at, and participation in, the *corpus delicti,* are affirmative material facts that the prosecution must show beyond a reasonable doubt to sustain a conviction. For the defendant to say he was not there is not an affirmative proposition; it is a denial of the existence of a material fact in the case. He meets the evidence of the prosecution by denying it. If a consideration of all the evidence in the case leaves a reasonable doubt of his presence, he must be acquitted."

I think the instruction, as given, was calculated to mislead, and in all probability did mislead, the jury. *S. v. Morgan,* 136 N. C., 628. The charge to the jury, in its different parts, should not be conflicting; and while a slightly inaccurate or incomplete instruction may be cured by subsequently supplying the defect or accurately stating the law, an erroneous placing of the burden of proof is not cured by a correct statement, widely separated from the excepted portion, and appearing elsewhere in the charge, unless the erroneous part is specifically withdrawn. *S. v. Falkner,* 182 N. C., 799, and cases there cited.

The rule as to the burden of proof is important and indispensable in the trial of causes. It constitutes a substantial right of the party upon whose adversary the burden rests, and hence it should be carefully guarded and rigidly enforced by the courts. *Hosiery Co. v. Express Co.,* 184 N. C., 480.

### ADDENDUM.

Since writing the above, two concurring opinions have been prepared and filed herein. To my mind, what is said in these opinions tends to strengthen rather than to weaken the position that prejudicial error was committed on the trial of this cause.

It is contended that the objection to the testimony of A. G. Corpening is not properly presented. Why not? The defendant objected and excepted to the question propounded to the witness. He then objected and excepted to the admission of his evidence. To say that the exception cannot be sustained because the defendant has not assigned the correct reason therefor, in my opinion, is untenable. The appeal is not here in any limited sense. I do not understand it to be the rule with us that when objection is made to the admission of evidence, counsel must state the ground upon which the objection is based, unless requested to do so by the court. This may be the practice in other jurisdictions, but not so in North Carolina; at least, up to the present time the rule has been

otherwise. The crucial point is that Corpening failed to qualify as a character witness, in the face of objection, and this is a condition precedent to his right to testify under our decisions. It must follow, therefore, that his evidence is incompetent, and that the defendant has been erroneously convicted. The sufficiency of the form of the objection and the materiality of the evidence now in question were both presented and directly considered in *S. v. Mills,* 184 N. C., 694.

HOKE, J., concurs in dissent.